Good morning, ladies and gentlemen. Our first case for argument is Cole v. Colvin, Mr. Rodman.  My name is Jason Scott Rodman. I represent the appellant in this case, Michael G. Cole. This is a step five case at the administrative law level. It is an appeal from a social security disability ruling that was also denied at the federal court level. The two big issues in this case concern, first, the role of the consultative examiner, doctor for the social security administration. And second, the role of unemployment insurance in the credibility assessment of the claimant at the social security level. Regarding the first, this court has a case on point. It's Beardsley v. Colvin. And that case establishes that to reject or discount a consultative examiner physician, the ALJ must provide, quote, good explanation. In this case, the Social Security Administration, ALJ, seems to provide other snippets from other doctor opinions, many of them preceding Dr. Barber, the consultative examiner's opinion. And specifically, the opinions cited, as well as many other doctor opinions, actually reinforce the consultative examiner physician opinion in this case. And now a lot of this is on the record. And you can read about it in the briefs. But I want to talk about today a couple of issues that reinforce the arguments in the brief, but are factual issues that line up with them as well. Specifically, circulatory and shortness of breath issues. It's one factor in Dr. Barber's assessment of Mr. Cole. Dr. Christman, in 2012 as well, his primary care physician for him, pointed out heart irregularities. And that's on AR 361. Dr. Kashyap pointed out chest pain and shortness of breath, also that same month. That's at AR 412. Second, I want to talk about gastrointestinal issues. Mr. Cole faced challenges during this time period, both in the upper part of the gastrointestinal tract and the lower part of the gastrointestinal tract. And so he was coughing up blood. Dr. Christman, again, at AR 359, documented that. Was that diagnosed? The diagnosis for some things like that might be up for debate. What does that mean? Has he been diagnosed with a gastrointestinal illness? He's been documented. I think the short answer is yes, Your Honor. So what is it? A gastrointestinal illness that he has been diagnosed with has included ulcers. It's also- What is the disease that he's been diagnosed with? What's it called? There has been dispute among doctors as to what it is, but they've definitely documented symptoms. Well, what are the alternatives? The one that's been most talked about in the briefing has been lymphadenopathy. And so that has to do with the swelling in his lymph nodes. There's debate as to what exactly caused that. There's debate among physicians. There's debate among experts if you go review the medical records. What did you call it? Lymphadenopathy. Lymphadenopathy. So it's basically- What's the second word? I'm sorry. It's all one word. Lymphadenopathy. Lymphadenopathy is one word. Okay. That's right. And it's basically an infection of the lymph nodes. And so he had a lot of pain in his left flank. He also had pain in lymph nodes underneath his shoulder. But like I said- Did those play a role in Dr. Barber's evaluation? One must assume they did, as I understand it.  Well, first off, I believe- I thought the focus here was primarily on orthopedic issues. Not to my knowledge. I believe that orthopedic issues are at issue in the case. However, it's an unfortunate record in that we don't have a lot of the orthopedic records in the case. The injuries that put him out of work were orthopedic, correct? The injuries that pushed him over the edge to keep him from being able to keep going back to work after he got injured, which is something he did for years and years and years and years, was when he was working in a trailer factory and he was up on a ladder fixing something and a camper with some sort of faulty backup camera backed into him and he crashed. He landed on his right arm, which was his good arm. His left arm is majorly problemed as well. And on his- Usually you catch your fall when you land on your right arm with your wrist. And when you catch your fall with your wrist, that prevents a lot of injury. He didn't do that. I don't know why exactly. I don't think the record makes it clear. But so he had very long and drawn out issues with recovering from that. They tried multiple different procedures. They tried an- They weren't necessarily sure that was going to work. And then it kind of didn't. Then they tried another procedure, similarly somewhat experimental. It also didn't work. Counsel, let me go. What was the basis for Dr. Barber's opinion? The basis for Dr. Barber's opinion was his full examination on a single visit. That's the way a consultative examiner works. Based on his functional abilities, based on Dr. Barber's internal medicine specialty at the visit. So he did all kinds of measurements. He did all kinds of tests and assessments based on his internal medicine specialty. Well, one of the jobs that the vocational examiner, vocational expert suggested was a telephone solicitor or something. I believe that's right, Your Honor. Well, can he hold a telephone or dial a number? Well, Mr. Barber, Dr. Barber's opinion would suggest that the problem with a telephone operator would be that he has to sit for at least six, eight hours a day. And Dr. Barber does not see him as able to do that. And neither does Dr. Gattaraju, another consultative examiner, who said he could sit for 30 minutes. And neither does Dr. Roth, who examined him in 2013, who can't see that he could undertake meaningful employment. So what is it that makes it difficult for him to sit? That's not his arms. Well, Dr. Barber said a couple different things. Among others, Dr. Barber did say that his right arm pain was severe enough and it actually affected his whole body. But what does that have to do with sitting? I think that the language Dr. Barber used was time to deal with his pain. But also at issue in this case is the lymphadenopathy and his other related issues under the Social Security Administration has got to be in combination. Lymphadenopathy, whatever it is. How is that related to sitting? I'm not an expert in that area. I'm not a medical doctor. But my understanding is that Dr. Barber, Dr. Kashap, the other doctors who had concern for his functional abilities would have been concerned that he had pain sitting down because his lymph nodes were in pain, but he also had his arm pain. Well, I don't understand how arm pain is related to sitting. I think that's a good medical question. I could look into it and document cases of how that's worked if you would like, Your Honor. It's a little late for that. Okay. I think that's a standing question, but I would leave, personally, I'd leave that to the physicians in the record to discuss. I think this brings me to the second point. Counsel, why don't you point us to what you think the errors were the ALJ made? The errors the ALJ made were that he, excuse me, she did not give the consultative examiner sufficient weight. And specifically, I mean, they're not necessarily entitled to huge weight, but they outright discarded this examiner's- The other error? The other error you want? The other error, thank you, Your Honor, is that the ALJ used the claim, it's Mr. Cole's disability, or excuse me, unemployment insurance against him. I can say more words about that if you would grant me time, Your Honor. It's in the briefs, thank you. Thank you. Okay, thank you, Mr. Rodman. Mr. Truitt. May it please the court, I'm Eric Truitt on behalf of the commissioner. We don't have to speculate about the basis of Dr. Barber's opinion, because if you look at the opinion form that he completed, which begins on page 399 of the administrative record, there's actually space on the form to indicate the basis for the opine two limitations. And the explanation that Dr. Barber provided for these limitations was either pain in the arm or pain in the groin. And that's why those were the issues that were briefed in the case. Now, these other impairments that he's referring to, those weren't really at issue. During the district court proceedings, nor through my- Well, wouldn't pain in the groin affect sitting? Pain in the groin does affect sitting. And the ALJ's main finding with respect to the groin pain was that it was short-lived. If you look at the medical evidence before and after Dr. Barber's August 2012 examination, there wasn't the same kind of evidence of groin pain that there was on that particular day. So if you look through the chronology of events, there's actually a treating source opinion from October 2011 that says that he has absolutely no difficulty sitting, standing, and walking. Then in 2012, there was either an MRI or a CT scan done that noticed some abnormalities in his lymph nodes and they did a biopsy. They did the biopsy and there was some swelling associated with the biopsy. And around that time, that was the biopsy, I believe, was two months before Dr. Barber examined him. Then by the time he goes to his ordinary doctor again in November of that same year, he's telling his doctor that he occasionally has pain and they intermittently swell. And then he tells another doctor in December of that same year that the pain from his groin impairments is well-controlled with medication. So at step two, the ALJ found that this impairment was not severe for a continuous 12-month period because it appears to have flared up around the time that Dr. Barber did the consultative examination. Why did she attach significance to the fact that he had not applied for disability benefits when he was receiving unemployment benefits? It was a combination of factors. It wasn't just the unemployment insurance. It was also the fact that he was not receiving any treatment for his arm impairments during that time as well. That's a separate point that she made. She seemed to think that the fact that he had, that seemed to be a major element in her analysis, the fact that he had been on unemployment, had been receiving unemployment benefits and he didn't ask for disability benefits. Seems perfectly logical. I don't understand what significance that has. Why would he ask for disability benefits when he's getting unemployment benefits? Well, a couple of things about that, Your Honor. First, I do think that there is an interplay between the workers' compensation. That's not answering my question. Typically, the reason why you draw negative inference from unemployment insurance is that you have to certify that you're ready and able and willing to work. And you typically have to document your job search efforts during the course of collecting unemployment insurance. So that's the logical basis for the negative inference. It seems, if I could follow up on Judge Posner's question, it's troubling here because the ALJ seems to have adopted a logic that punishes people who are in the border areas and trying hard to find work. In this case, Mr. Cole was not well-educated. He was an industrial worker. Was this in the Elkhart area? I'm not sure if it's on my address. The RV industry? Yeah, I do believe it's in that area. Okay, and he lost his job. He gets hurt and we have the worst economic crisis in most people's current lifetimes, which hit that particular industry very, very hard. But he's got a long work history. He's trying to get back to work. He says he's looking for work. But eventually, those benefits run out. He hasn't been able to find another job and he's not physically able, he says, to go ahead. Why would you adopt a credibility analysis that discourages such efforts? It doesn't discourage such efforts, but that's why I brought up the fact that the ALJ discussed the treatment. Why doesn't it discourage those efforts? I think what the ALJ was saying is that if he was really unable to work and was trying very hard to go back to work, it's unlikely that you would see no medical treatment during that time, because if you've experienced that- That's a separate point. That's a separate point and one that the ALJ didn't seem to explore, for reasons, did she? If you turn to page, it is on page, let me see the page of the decision that it takes place. The analysis is on page 25 of the record, page nine of the ALJ's decision. Yes. And the ALJ says, and it is important to note that the ALJ did give credit to a lot of his complaints. He was an industrial worker who was working at a medium exertional level. The jobs identified by the vocational expert were light and sedentary exertional. And then the ALJ explained the chronology, both of his, the end of his workers' compensation settlement, the lack of treatment, as well as the timing of his application for disability benefits. Did she ever ask him why he didn't seek treatment during those months? The ALJ did not ask. Social Security ruling 96-7-P says if there's a reason evident in the record, then the ALJ should consider that explanation. But he's never provided an explanation for the lack of treatment. Was the issue even raised in the hearing? I mean, it's raised in every hearing because the regulations make clear that treatment history. With him. I don't believe there was a specific question asked. We're talking here about, let's say, the worst economic crisis in 80 years, if I'm doing the math roughly correctly. And a fellow who at the time is on unemployment compensation. I'm not sure what she means by saying he had sufficient income while he's unemployed at that time. And I just don't, I don't get this logic. I mean, I, again, when the ALJ said further support for this is evident that he essentially had no treatment after his independent medical examination, I believe the ALJ is saying we have two doctors that say you're released to go back to work. You collect unemployment insurance. You're not getting any medical treatment. There's no evidence that these problems are continuing. It's that reference to unemployment that bothers me. What she said, the ALJ, the timing of his filing for disability benefits, December 2010, appears to coincide with when his unemployment benefits were running out. The timing of his application suggests it was economic need, not disabling medical conditions, that prompted the claimant to seek disability benefits. I don't understand that. He's receiving unemployment benefits. And for all we know, I don't know, it looks as if his unemployment benefits probably were better than his disability benefits. Well, it's possible, but again, you know, under most states- Wait a second, would you please? So if he's receiving these unemployment benefits, says he was getting 7,000, you know, in the fourth quarter of 2009 and so on, got that for four quarters, that's almost 30,000. That's more than I think you get from social security disability. So why wouldn't it be perfectly sensible for him, if he's doing better with unemployment benefits, to wait till they run out before he asks for social security? Well, to collect unemployment benefits, you're supposed to be able to work, whereas to collect disability benefits, you're supposed to be unable not only to do- I mean, it's a separate issue. Maybe he shouldn't have gotten unemployment benefits, who knows, or maybe he would, maybe he, you know, he looked for jobs and maybe hoped he could get something he could do. But I don't understand the logic. I don't understand where she gets the idea that economic need rather than medical problems pushed him there. Well, both the act and the regulations say that the actual availability of work is not what's relevant to disability. What's relevant to disability is your medical ability to work. That's true, but if you're trying to evaluate somebody's credibility, you've got to look at the realities that they're facing. And, you know, he's not so obviously disabled that he can't try to get to find work. You know, he's in this gray area where he tries to find work, presumably to qualify for the unemployment insurance. That runs out and he hasn't found anything yet, so. Well, even if he's in the gray area, it's important to note that the vocational expert identified sedentary jobs. Yeah, I wonder about those jobs. What's a rental consultant? Rental consultant, have you ever seen the company, for example, Rent-A-Center? It's a $750 million company. Oh, come on. He can't get a job like this. You said he didn't have education. That job doesn't require education. You know, work for a $150 million company? Come on. I mean, the- That's ridiculous, forget it. What does a bakery production worker do? Bakery production worker is... I don't have that printout from the dictionary occupational titles. I'm sorry, I don't have the specific description of that job, but there's several jobs here, both at the light and sedentary exertional levels that were never challenged. I'd like to point out that he had his own vocational expert, Christopher Young. He was certainly capable of offering counter-expert testimony. And getting back to Judge Hamilton's point, even if, for example, you found that this was a relatively weak inference, the main point remains that you have two doctors deciding his workers' compensation case that are saying, as of May 2009, he's able to work. There's no medical evidence for almost two years, and then you have this late-developing groin impairment. So even if we give the claimant the benefit or the doubt in this case, there's still substantial evidence in support of the ALJ's decision. You have the medical evidence. There's evidence that can support it. My question is about the logic. I understand. I think it's assumed that there's a basic inconsistency. Even though it's understandable from an individual perspective, from running a program perspective, you don't want a claimant representing to one agency that they're able to work, and then representing to your agency that they're unable to work. Thank you. Okay, well, thank you, Mr. Kul. Do you have anything further, Mr. Rodman? Thank you, Your Honors. First, briefly, regarding unemployment insurance, my understanding is all that applying for unemployment insurance means by Mr. Kul, he's not a physician, is that he wants to work, he hopes to work, he desires to work. Secondly, regarding the good explanation needed for rejecting or discarding a consultative examiner physician opinion, I think that the Carradine case, cited in both of the key cases, cited in both arguments here, both in Scroggum and in Beardsley from 2004 applies, and the holding of that case is that if you've got a condition for which surgery has been required and pain meds are required, it doesn't mean that it's not a substantial condition. It means it is a substantial condition, and it reinforces that the pain is credible by the claimant. I also wanted to respond to your earlier question as to the diagnosis of Dr. Barber. I looked in my notes and in the record briefly, it seems he referenced, quote, left groin swelling, quote, groin pain, and he also used the phrase definitive diagnosis not given. As for the work that Mr. Kul has done generally, my understanding of the 15 year look back period is that nine of the 15 years looked at, he worked at least two jobs. So, he's- And was this in the Elkhart area? It was actually in Middlebury, Indiana, which is a little town right next to Elkhart, but it's an Elkhart- In the Elkhart area and part of the RV industry? Absolutely, Your Honor. Okay. Okay, well, thank you, Mr. Truitt. May I say one more quick thing? Yeah, but make it quick. Just that at the least, I think that the ALJ should have considered a closed period or a period going forward of disability. Thank you, Your Honors. Okay, thanks. I'd like to ask you, Mr. Rodman, you come back here, I have a question for you. I'm not Mr. Rod, I'm sorry, Mr. Truitt. I need to ask Mr. Truitt something. Yes, Your Honor. Are you familiar with our cases in which we have upheld disability benefits for people who in fact are working? Yes, there are cases- Yeah, there are cases. That is, there are people who are totally disabled, but because of desperation, they will force themselves to work. And there are cases going the other way as well. Yeah, I know. But the fact that he's getting unemployment benefits, which as you say, you think it's very important that he actually have been seeking work. He could be seriously disabled, but seeking work. It's the same issue we have when the ALJs talk about the applicants doing work at home, cooking, taking care of kids. There's no alternative for these people. When there's no alternative, they will do things that are very bad for their health. Now, how do we know that isn't the situation with Cole, that he was getting unemployment benefits in the hope that he'd be able to find a job, which he wasn't able to do? And that is why I referred to the medical opinions right at that time, two doctors releasing him for full work, and also the lack of any medical treatment during that two-year period. If he was bending over backwards to do as much as he could, stands to reason he would suffer some sort of pain, need some sort of treatment to bravely go forward. And that's why, at the beginning of this discussion, I thought it was important to consider all these factors in combination as opposed to splitting them apart, because each factor standing on its own could be persuasive in an individual case, but if you look at all of the factors combined, the medical opinion evidence, the objective medical evidence, the lack of treatment during the relevant time, and the unemployment insurance, all of those things combined together are more persuasive than any individual factor considered in isolation. Okay, thanks. Thank you. So thank you to both counsel. Move to our.